OPINION OF THE COURT
Evelyn J. Laporte, J.
A pretrial Dunaway/Huntley/Wade/vohint&riness suppression hearing was conducted before me on July 6, 2015. Police Officers Nysia Stroud and Eric Ruiz, both of the 71st Precinct when this incident occurred, were the People’s witnesses. The defendant did not call any witnesses.
I find the testimony of both police officers to have been credible. I make the following findings of fact:
Findings of Fact
Officer Stroud testified that she has been an officer with the NYPD for 4V2 years, and on January 8, 2014 was assigned to patrol at the 71st Precinct. At approximately 3:55 p.m. on that date, she was in an RMP (radio motor patrol car) with her partner, Officer Tejada, when they received a radio run of an assault in progress at 1760 Union Street. Officer Stroud and Officer Tejada were assigned as backup and proceeded to the address. They were the first officers to arrive at the location. Officer Stroud entered the apartment building lobby and was approached by a man named Robert Williams. Mr. Williams told her that his stepfather had been assaulted and that the perpetrator was in apartment A-2. He also stated the complainant, Tahir Younis, was already at the hospital. He then led Officer Stroud to apartment A-2, she knocked on the door, and an older woman answered. The officer asked her if there were others in the apartment with her. The woman replied that there was a lady and a young man present. Officer Stroud asked if the young man could come to the door.
Officer Stroud further testified that the defendant came to the door and she asked him if he had anything in his possession that could hurt her or himself. The defendant denied such possession. When the defendant appeared at the door, Mr. Williams said, “that’s him.” During direct examination, Officer Stroud made an in-court identification of the defendant as the man who came to the door.
Officer Stroud also testified she asked the defendant if he was involved in a fight. She stated that her partner, Officer Tejada, was with her at the door when she posed this question. *600 Both officers had their guns holstered, and they issued no threats or promises to the defendant. The defendant replied in the affirmative and proceeded to explain that the complainant had asked him for directions in the lobby. As they walked past each other, they bumped each other and a fight ensued. This statement was the subject of the voluntariness hearing, since the People failed to serve notice of the statement to the defendant pursuant to the requirements of CPL 710.30 (1) (a).
As this conversation between Officer Stroud and the defendant took place, Robert Williams was located on the stairwell near apartment A-2 and was videotaping it on his cellular phone. Officer Stroud testified she asked Mr. Williams to refrain from videotaping the conversation and had no knowledge he had continued to tape the interaction.
Officer Stroud asked the defendant to step out of the apartment, patted him down, and then placed him under arrest. She escorted the defendant out of the building to the RMP, briefly meeting up with Officer Ruiz. She then transported the defendant to the 71st Precinct.
A disk containing the videotape of the conversation between Officer Stroud and the defendant was identified by the Officer and played in court. She further testified she had not known of the existence of the video until recently, when the prosecutor showed it to her.
On cross-examination, Officer Stroud testified that upon arrival at the scene, Robert Williams informed her his stepfather was assaulted, that Mr. Williams had seen the perpetrator standing over his stepfather, but did not see the actual attack. Mr. Williams did not tell Officer Stroud the complainant had identified the perpetrator. The officer did not read the Miranda warnings to the defendant because she was not the arresting officer. Officer Stroud explained Officer Ruiz was the arresting officer, that she turned the defendant over to the desk sergeant upon arrival at the precinct, and the sergeant, in turn, delivered him to Officer Ruiz. Officer Stroud later relayed all relevant information to Officer Ruiz about what she had learned when she was at the location of the incident.
Police Officer Eric Ruiz testified he has been with the NYPD for 17 years. He covers patrol and has made over 300 arrests. On January 8, 2014, he was working with his partner Officer Lluka, and received a radio run of an assault in progress. The call came in at 3:53 p.m., and he arrived on the scene at 4:25 p.m. When he arrived, Officer Stroud and her partner were *601 standing in front of the building with the defendant. Officer Ruiz then made an in-court identification of the defendant.
At the 71st Precinct, Officer Ruiz had a conversation with Officer Stroud, who told him the defendant had been identified at the scene by Robert Williams as being involved in the assault. She also informed Officer Ruiz that the complainant was at Kings County Hospital.
During his direct testimony, Officer Ruiz stated while at the precinct, he used his cellular phone to take a head shot photo of the defendant. The defendant was placed against a wall with no markings on it, located outside the cell where the officer intended to lodge the defendant. The officer then went to Kings County Hospital and arrived around 6:00 p.m.
Upon arrival at the hospital, Officer Ruiz first spoke with Robert Williams, who explained he had seen the defendant standing over the complainant screaming and cursing in a “fighting manner.” He showed Mr. Williams the photo of the defendant he had taken at the precinct with his cell phone. Mr. Williams identified the defendant in the photo when he was asked by Officer Ruiz if he recognized anyone.
Officer Ruiz further testified he spoke with the complainant, Tahir Younis, and observed he had a severe break of his ankle, by all appearances. Mr. Younis told the officer that the perpetrator approached him in the hallway of the first floor, they had some words, the perpetrator pushed him, then they got into a fight. Mr. Younis was pushed to the ground, and the perpetrator stomped on his leg, while cursing and screaming at him. Officer Ruiz showed the complainant the single photo on his cell phone. The complainant identified the defendant as the perpetrator.
When Officer Ruiz returned to the precinct, he tried to email the photo from his cell phone to his NYPD email account, but he testified it must have gotten lost during the attempt. Later that evening at approximately 7:35 p.m., while fingerprinting the defendant, Mr. Jackson stated he wanted to press charges because his back was hurting. The officer testified the defendant did not make the statement in response to any question posed by the officer. This statement was the subject of the notice given pursuant to CPL 710.30 (1) (a).
On cross-examination, Officer Ruiz stated he was told by Officer Stroud the parties live in the same building, however neither Robert Williams nor Tahir Younis indicated they knew *602 the defendant. He further testified the complainant did not mention there were any witnesses to the incident.
Arguments of Counsel
The People argue Officer Stroud had probable cause to arrest the defendant once Mr. Williams had identified him, and pursuant to defendant’s own statement admitting his participation in the fight with the complainant. Additionally, the prosecutor argues the identity of the defendant is not an issue here, and therefore, the court should not be concerned about whether there was any suggestiveness in the identification procedure. The People cite People v Gissendanner (48 NY2d 543 [1979]) for this proposition. Alternatively, they argue that the photographic showup was part of an unbroken chain of events, and is therefore an acceptable identification procedure under the circumstances.
The defendant argues that the police arranged identification procedure was unduly suggestive, that there were no exigent circumstances, and failure to preserve the photo raises a presumption that the photograph itself was suggestive. Additionally, defendant asks the court to deny the People a separate independent source hearing, since they should have originally conducted a bifurcated hearing and addressed this issue during the course of the Wade hearing.
Both parties relied on the record regarding the Huntley and voluntariness portion of the hearing.
Conclusions of Law
Dunaway Hearing
In connection with the arrest of the defendant, the court must determine the lawfulness of the initial encounter between the defendant and the police which led to his subsequent arrest. (People v De Bour, 40 NY2d 210 [1976].)
Under CPL 70.10 (2), reasonable cause to believe a person committed an offense exists when reliable evidence or information discloses facts or circumstances which are collectively sufficient and persuasive so as to convince a person of ordinary intelligence, judgment and experience that it is reasonably likely that such an offense was committed and that such person committed it.
At a Dunaway hearing, the People have the burden of going forward with credible evidence tending to show the police officers acted lawfully, and the defendant has the burden of prov *603 ing by a preponderance of the evidence that the officers acted illegally. (People v Chipp, 75 NY2d 327, 335 [1990].)
It is well settled that information provided by an identified citizen accusing another individual of the commission of a specific crime is sufficient to provide the police with probable cause to make an arrest. (People v Hairston, 117 AD2d 618, 620 [2d Dept 1986].)
In this case, Officer Stroud arrived on the scene and was told by Robert Williams that his stepfather had been assaulted. He then led her to the apartment in which the perpetrator was located. At the apartment, when the defendant appeared at the door, he was identified as the perpetrator by Mr.Williams. Based upon this accusation, under the totality of the circumstances, the officer had probable cause to arrest the defendant. The court finds that the defendant’s arrest was as a result of lawful police conduct and was constitutionally permissible. (People v Ragusa, 112 AD2d 956 [2d Dept 1985].) Therefore, defendant’s Dunaway motion is denied.
Voluntariness Hearing
The defendant moves to preclude a statement for failure to provide the required notice pursuant to CPL 710.30 (1) (a). The statement at issue was made by the defendant in the doorway and videotaped by Robert Williams. The People have conceded they failed to give notice, but requested a hearing to determine whether the statement was made voluntarily. The prosecutor has not informed the court as to whether he seeks to use the statement to impeach (People v Harris, 25 NY2d 175 [1969]), or in response to the defense opening the door (People v Goodson, 57 NY2d 828 [1982]) or on rebuttal (People v Rigo, 273 AD2d 258 [2d Dept 2000]). The prosecutor should inform the court of his intention promptly.
CPL 60.45 (2) governs the admissibility of statements. It provides that a statement is inadmissible if it was involuntarily made, and defines an involuntary statement. It states in relevant part:
“2. A confession, admission or other statement is ‘involuntarily made’ by a defendant when it is obtained from him:
“(a) By any person by the use or threatened use of physical force upon the defendant or another person, or by means of any other improper conduct or undue pressure which impaired the defendant’s physical or mental condition to the extent of *604 undermining his ability to make a choice whether or not to make a statement; or “(b) By a public servant engaged in law enforcement activity or by a person then acting under his direction or in cooperation with him:
“(i) by means of any promise or statement of fact, which promise or statement creates a substantial risk that the defendant might falsely incriminate himself; or
“(ii) in violation of such rights as the defendant may derive from the constitution of this state or of the United States.”
To determine whether the statement in this case was voluntary, an analysis of People v De Bour is required. In De Bour, the Court of Appeals set forth four levels of police intrusion and the degree of knowledge necessary to reach each level:
1. A police officer may approach a citizen to request information when there is some objectively credible reason for doing so.
2. Under the common-law right to inquire, the officer may make a more pointed inquiry and intrude on a person’s privacy when the officer has a founded suspicion that criminal activity is afoot.
3. Where a police officer has a reasonable suspicion that a particular person has committed, is committing or is about to commit a crime, he may forcibly stop and detain that person. With reasonable suspicion, the officer may also stop and frisk a person when the officer reasonably suspects that he is in danger of physical injury by a person he reasonably believes is armed.
4. Finally, a police officer may arrest and take into custody a person when he has probable cause to believe that person has committed a crime.
In this case, Mr. Williams identified the defendant as he appeared at the door of the apartment and spoke with Officer Stroud. As previously mentioned, this identification gave the officer probable cause to arrest the defendant. However, prior to making an arrest, the officer testified she spoke to the defendant as he stood at the door and asked him if he was involved in a fight. This was the equivalent of a level two inquiry under De Bour and was permissible under the totality of the circumstances.
When Officer Stroud made the inquiry, the defendant was not in handcuffs and the officers had not drawn their weapons. *605 The question was designed to “clarify the nature of the situation confronted, rather than to coerce a statement . . . [T]he single question and answer were not a part of an interrogation of a suspect.” (People v Huffman, 41 NY2d 29, 34 [1976].) When a statement is made at the scene of a crime in response to investigative inquiries, that statement is not made as the result of custodial interrogation. (People v Gonzalez, 179 AD2d 775 [2d Dept 1992].) Additionally, when, as here, a person’s freedom of movement is not constrained to the degree associated with a formal arrest, Miranda warnings need not be given prior to questioning. (People v Bennett, 70 NY2d 891 [1987].)
The statement made by the defendant at the doorway to the apartment was not made when he was under arrest or as the result of custodial interrogation. No threat was issued, no promises were made, nor was any force used to coerce a statement. Additionally, the officers’ guns were holstered while the conversation took place. Under these circumstances, Miranda warnings were not required, and the defendant’s statement was voluntary.
Huntley Hearing
The defendant also moves to suppress his noticed statement pursuant to People v Huntley (15 NY2d 72 [1965]). In support of his motion, the defendant claims he never waived his constitutional rights by express statement or conduct, therefore, his statement was not voluntarily given. Under Miranda v Arizona (384 US 436 [1966]), the defendant’s statement is subject to suppression if it was a product of custodial interrogation.
In connection with the defendant’s motion to suppress his statement, the People have the burden of proving voluntariness and a knowing waiver by the defendant of his constitutional rights beyond a reasonable doubt. (CPL 710.70 [3].)
The statement for which notice was given was made at the precinct when Officer Ruiz was fingerprinting the defendant. The defendant stated he wanted to press charges because his back was hurting. Since the defendant was in police custody, the analysis of whether this statement was voluntarily given focuses on somewhat different factors. The uncontested evidence here shows that this statement was not made in response to any question posed to the defendant, and was not obtained during custodial interrogation. The statement was spontaneous and voluntary. A spontaneous, volunteered statement is one made without any external prompting. (People v Lynes, 49 NY2d 286 [1980].)
*606 There is no evidence that while fingerprinting the defendant, the police officer said or did anything from which the defendant might reasonably have inferred the officer had any interest in eliciting a statement from him. (People v Lanahan, 55 NY2d 711 [1981].) In fact, the evidence supports a finding beyond a reasonable doubt that the defendant’s statement was spontaneous, wholly self-generated, and not the result of any inducement or threat. (People v Lynes.) The statement was not attributable to police suggestion or prompting. (People v Eldridge, 213 AD2d 667 [2d Dept 1995].) Therefore, defendant’s motion to suppress the statement in this case is denied.
Wade Hearing
The defendant moves, pursuant to United States v Wade (388 US 218 [1967]), to suppress a photo identification made by two witnesses several hours after the occurrence of this incident. The threshold issue is whether the identification of the defendant was made as a consequence of a police arranged procedure. If it was, then the court must determine the reasonableness of the police conduct and any suggestiveness in conducting the identification procedure. If the identification has been tainted by suggestiveness, then the issue is whether the witness has an independent source upon which to base an in-court identification.
In connection with police arranged identification procedures, the People have the initial burden of going forward to establish the legality of the police conduct and the lack of suggestiveness in the identification procedures used. If the People satisfy their initial burden of going forward, then the defendant has the burden of proving that the identification procedure was unduly suggestive by a preponderance of the evidence. (People v Berrios, 28 NY2d 361 [1971].) If the defense meets its burden of proving the identification procedure was unduly suggestive, then the burden shifts to the People to prove, by clear and convincing evidence, the existence of an independent source for the witness’ identification. (People v Rahming, 26 NY2d 411, 417 [1970].)
It is firmly established in our jurisprudence that unduly suggestive pretrial identification procedures violate due process and therefore are not admissible to determine the guilt or innocence of an accused (United States v Wade, 388 US 218 [1967]; People v Blake, 35 NY2d 331 [1974]; People v Riley, 70 NY2d 523 [1987]; People v Adams, 53 NY2d 241 [1981]).
Here, the People have made a rather specious argument regarding People v Gissendanner (48 NY2d 543 [1979]), claim *607 ing that suggestiveness is not a concern in this case because the defendant’s identity is not in issue. (People’s mem of law at 2-3.) However, the testimony was clear the parties are strangers and were totally unknown to each other prior to this incident. Additionally, in Gissendanner, there were no police arranged identification procedures involved and the identifying witnesses were police officers, not civilians. The People’s reliance on this case is thoroughly misplaced.
In further support of their argument, the People cite a whole host of cases related to a corporeal showup identification procedure, arguing unpersuasively that the instant identification, which consisted of a single, unpreserved photograph of the defendant taken on the officer’s cell phone, then shown to the witnesses more than two hours after the incident, was part of an unbroken chain of events.
The court finds that the perpetrator’s identity is an important issue in this case and the suggestiveness of the procedure used here is a concern when Officer Ruiz testified he showed a single photograph of the defendant to both witnesses. This type of identification procedure has been held to be unduly suggestive. (People v Mallory, 126 AD2d 750 [2d Dept 1987]; People v Osgood, 89 AD2d 76 [2d Dept 1982].) To compound the problem, the photo was on the officer’s cell phone, which likely communicated that the subject of the photo was already in police custody. In addition, this court did not have the opportunity to evaluate the photograph of the defendant taken by Officer Ruiz, because it was not preserved. Since the photo was taken in the 71st Precinct, the photo may have contained other suggestive elements, as well.
The Court of Appeals has held that showups are, by their very nature, suggestive and are strongly disfavored. (.People v Riley.) Corporeal showups are permissible, however, when exigent circumstances require immediate identification, or if the suspects are captured at or near the crime scene and can be viewed by witnesses immediately. (People v Rivera, 22 NY2d 453 [1968]; People v Love, 57 NY2d 1023 [1982]; see also People v Brnja, 50 NY2d 366 [1980]; People v Duuvon, 77 NY2d 541, 544 [1991].) Exigent circumstances have included situations where an eyewitness is in the hospital suffering from critical wounds and may not survive (People v Rivera; People v Howard, 22 NY3d 388 [2013]), or where the complainant is at or near the scene but has a need to leave to obtain prompt medical treatment. (People v Smith, 286 AD2d 636 [1st Dept 2001].) *608 Showups not based upon exigent circumstances are sanctioned only when the identification represents circumstances in an unbroken chain of events: crime, escape, pursuit, apprehension and identification all occurring within a limited geographical area, close in time to the crime. (People v Hawkins, 188 AD2d 616 [2d Dept 1992].) None of these factors exist in the case at bar.
While the People attempted to argue this case had an unbroken chain of events, this court finds there were actually many intervening events: a change of police officers, the detention of the defendant at the precinct, the complainant leaving the scene and going to the hospital emergency room, and the witness following the complainant to the hospital. The identification procedure in this case was the antithesis of a prompt, on the scene showup. Additionally, the record is devoid of any exigent circumstances. The witnesses testified that the defendant had already been identified by Robert Williams and was in custody, and the complainant had left the scene to seek medical treatment. Although, as per the observations of Officer Ruiz, the complainant had a severe break of his ankle and it is reasonable to assume it was painful, there is no evidence that the complainant’s injuries were life threatening. During the two-hour time lapse between the incident and the identification procedure, Officer Ruiz had sufficient time to create a photo array but regrettably failed to do so.
The Court has held a showup identification is inadmissible when there was no effort to make provision for a reliable identification and the combined results of the procedures employed establish that the showup was unduly suggestive. (People v Adams, 53 NY2d 241, 249 [1981].) In addition, even when the police use the preferred method of displaying a photographic array, the array shown to witnesses must be preserved and a failure to do so raises an inference that it was impermissibly suggestive and may result in the suppression of any resulting identification. (People v Galletti, 239 AD2d 598 [2d Dept 1997]; People v Wedgeworth, 156 AD2d 529 [2d Dept 1989]; People v Stokes, 139 AD2d 785 [2d Dept 1988]; People v Bratton, 133 AD2d 408 [2d Dept 1987]; People v Johnson, 106 AD2d 469 [2d Dept 1984].)
Here, the procedure utilized by Officer Ruiz began as potentially suggestive, where a single photo was shown to the witnesses. The suggestiveness was enhanced by the fact that the photo was on the officer’s cell phone. In addition, the photo *609 was not preserved, raising a presumption of suggestiveness of the photo itself. This court finds the defendant has met his burden of proving the identification procedure utilized by the police in this case was unduly suggestive. Therefore, the court must determine if the witnesses have an independent source to provide an in-court identification of the defendant at trial.
Independent Source Hearing
A witness may identify the perpetrator of a crime as part of his in-court testimony, notwithstanding the existence of a procedurally defective pretrial identification procedure, provided the People establish by clear and convincing evidence the in-court identification is based on the witness’ independent observation of the defendant. (People v Hyatt, 162 AD2d 713 [2d Dept 1990].)
While the court agrees with the defendant that it would have been a more efficient use of court resources to conduct a bifurcated hearing, the court will grant the People an opportunity to establish the witnesses have an independent source to make an in-court identification of the defendant.